# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| LAWRENCE E. EARLS, JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:11-CV-00435-TWP-TAB |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |

## ENTRY ON JUDICIAL REVIEW

Plaintiff, Lawrence E. Earls, Jr., ("Mr. Earls"), requests judicial review of the decision of the Defendant, Michael J. Astrue, Commissioner of the Social Security Administration ("the Commissioner"), denying Mr. Earls's application for Disability Insurance Benefits ("DIB"). For the reasons set forth below, the Commissioner's decision is **REMANDED** for further proceedings consistent with this opinion.

## I. BACKGROUND

### A.    Age, Education and Work History

Mr. Earls was born on July 6, 1962, making him 43 years old at the time of the alleged onset date of August 15, 2005. (R. at 75.) Mr. Earls has a high school education, (R. at 124), and his past relevant work experience is as a baker, night watchman and survey laborer. (R. at 632.)

### B.    Procedural History

Mr. Earls filed an application for DIB on March 31, 2006, alleging he became disabled on August 15, 2005. (R. at 75.) Mr. Earls's application was denied initially, (R. at 55), and upon

reconsideration.  (R. at 54.)  On October 14, 2008, Mr. Earls appeared with counsel before Administrative Law Judge Michael D. Tucevich ("the ALJ"), and limited testimony was heard from medical expert Steven Gerber, M.D. ("Dr. Gerber") (R. at 601-09).  On July 29, 2009, Dr. Gerber provided further testimony by responding to interrogatories submitted by Mr. Earls's counsel.  (R. at 558-62, 607-08.)  On May 20, 2009, a supplemental hearing was held and  Mr. Earls and David Janus, a vocational expert, offered testimony.  (R. at 610, 632-35.)  On September 8, 2009, the ALJ issued a decision finding that Mr. Earls was not disabled from August 15, 2005 through the date last insured.  (R. at 13-27.)  On February 9, 2011, the Appeals Council denied Mr. Earls's request for a review of the ALJ's decision.  (R. at 4-6.)  As a result, the ALJ's decision is the final decision of the Commissioner.  *See* 20 C.F.R. § 404.981 (2012).

**C.**    **Medical History**

      **1.**    **Medical History Prior to Onset Date of August 15, 2005**

On April 2, 2001, Mr. Earls saw William Eaton, M.D. ("Dr. Eaton"), complaining of leg and back pain.  (R. at 453.)  Dr. Eaton recommended x-rays of the sacrum bone and prescribed the anti-inflammatory drug Naproxen. (R. at 453.) On April 11, 2001, x-rays of the sacrum revealed "[a]bnormal angulation of the coccygeal segments . . . consistent with post traumatic change."  (R. at 455).  On April 20, 2001, Mr. Earls had a follow-up with Dr. Eaton and reported that the medication was not helping the pain in his sacrum.  (R. at 441.)  Dr. Eaton encouraged Mr. Earls to see a neurosurgeon or orthopedist for further evaluation.  (R. at 442.)

On April 27, 2001, Mr. Earls was injured while at work when he was accidently thrown from a heavy piece of equipment.  (R. at 446.)  He was admitted to Fawcett Memorial Hospital and it was determined that he had sustained a fracture to the right hip.  *Id.*  The following day Mr. Earls had surgery on his right hip.  (R. at 353, 447.)

On May 16, 2001, following his surgery, Mr. Earls was seen at the Advanced Orthopedic Center by Dale A. Greenberg, M.D. ("Dr. Greenberg").  (R. at 350.)  Mr. Earls complained of some paresthesias in his left arm and left leg, *Id.*, a symptom that causes a burning or prickling sensation often felt in the arms or legs and is usually described as tingling or numbness. Parensthesia Information Page, Nat'l Inst. of Neurological Disorders & Stroke (May 6, 2010), http://www.ninds.nih.gov/disorders/paraesthesia/paraesthesia.htm.  Dr. Greenberg diagnosed Mr. Earls with status post open reduction internal fixation of right hip with persistent wound drainage of the right hip, lumbar strain, right knee sprain/contusion, and paresthesias of the left side of unknown etiology.  (R. at 350.)

On June 19, 2001, Mr. Earls visited Dr. Eaton and complained of daily headaches since his work accident.  (R. at 439.)  Dr. Eaton determined Mr. Earls had absent right patella reflexes and subjective numbness on his left side.  (R. at 439-40).  Dr. Eaton recommended a neurologist and prescribed Atenolol as well as an increase in Imitrex, (R. at 440); both drugs are used to treat migraines.  On July 3, 2001, Mr. Earls again complained to Dr. Eaton of continued migraines occurring every day and instability in his hip and knee.  (R. at 437.)

On July 9, 2001, Theodore G. Probst, M.D. ("Dr. Probst"), a neurologist, reviewed magnetic resonance imaging ("MRI") scans of Mr. Earls's brain and cervical spine.  (R. at 431.) Dr. Probst found no injury in the brain, but discovered some mild neural foraminal narrowing in the cervical spine.  The scan, however, revealed no "clear-cut spinal cord injury."  (R. at 431.) Dr. Probst examined Mr. Earls and reported numbness on his left side and difficulty with eliciting abdominal reflexes.  *Id.*  Dr. Probst diagnosed him with Brown-Sequard Syndrome, *Id.*, a "neurological condition characterized by a lesion in the spinal cord which results in weakness or paralysis . . . on one side of the body and a loss of sensation . . . on the opposite side."  Brown-

3

Sequard Syndrome Information Page, Nat'l Inst. of Neurological Disorders & Stroke (Sept. 29, 2011), http://www.ninds.nih.gov/disorders/brown_sequard/brown-sequard.htm.  Brown-Sequard also impairs bowel functions and causes migraines as well as frequent falls.  (R. at 265.)  Dr. Probst diagnosed Mr. Earls with a spinal cord injury and a headache disorder that was probably post-concussion syndrome and prescribed Topamax to help decrease Mr. Earls's migraine headaches as well as his numbness. (R. at 431.)

On July 11, 2001, Mr. Earls returned to Dr. Greenberg and complained of pain in his right hip and right knee.  (R. at 347-48.)  Dr. Greenberg noted that an exam showed some crepitus, and tenderness in the joint line of the knee, but Mr. Earls's range of motion was good. (R. at 347.)  In regards to Mr. Earls's hip, Dr. Greenberg noted that Mr. Earls had soft tissue pain, but the x-rays showed good position of the hip hardware and fracture fragments.  *Id.*  At the same time, Dr. Greenberg believed the hardware would need to be removed sometime in the future because it would become too prominent due to Mr. Earls's thinness.  *Id.*

On August 8, 2001, Mr. Earls saw Dr. Greenberg for a follow-up visit, still complaining of pain in the right hip and right knee.  (R. at 346.)  Dr. Greenberg noted that he could not explain Mr. Earls's hip pain but concluded that Mr. Earls was unable to work in his usual capacity.  *Id.*  Dr. Greenberg indicated that he would consider a sedentary job for Mr. Earls if he could first see a list of the activities involved in the job.  *Id.*

On January 18, 2002, Mr. Earls complained to Dr. Eaton of headaches despite taking Imitrex.  (R. at 424.)  In addition, Mr. Earls reported increased hip pain with cold weather.  *Id.* Dr. Eaton diagnosed Mr. Earls with chronic and frequent daily headaches.  (R. at 425).  On February 20, 2002, Mr. Earls returned to Dr. Greenberg complaining of pain in his right hip and knee.  (R. at 345.)  After examining Mr. Earls, Dr. Greenberg indicated that Mr. Earls's right

4

knee had swelling, but he was "neurovascularly intact." *Id.* X-rays showed that Mr. Earls's knee was normal within the limits of his age, and his right hip fracture had healed. *Id.* Although the hip hardware was found to be in "satisfactory position and alignment," Dr. Greenberg recommended that the hardware be removed. *Id.*

On March 19, 2002, Mr. Earls was seen at the Advanced Orthopedic Center by Nicholas J. Connors, M.D. (R. at 343). Mr. Earls complained of pain in the right hip and indicated that he wished to have the hip hardware taken out. *Id.* Dr. Connors advised him that removal of the hardware was not a guarantee in solving his pain, and in fact, it could make it worse. *Id.* On March 29, 2002, Dr. Connors removed Mr. Earls's hip hardware. (R. at 469.) On April 16, 2002, Mr. Earls reported to Dr. Connors that he was still experiencing some pain in the right hip. (R. at 341.) Dr. Connors advised Mr. Earls to continue using his cane for partial weight-bearing on his right side. *Id.* On May 21, 2002, Mr. Earls indicated that his hip felt better, but he was experiencing a sensation of "catching" and "popping" in the hip joint. *Id.* Dr. Connors' exam discovered some patellofemoral crepitus in his right leg, as well as "painful internal and external rotation of his hip located in the groin." *Id.*

In July 2002, Mr. Earls continued to report to Dr. Connors that he was experiencing the same pain and had not noticed much difference since the removal of the hardware. (R. at 340.) Dr. Connors diagnosed Mr. Earls with "right hip pain secondary to the soft tissue injury from his fracture" and indicated to Mr. Earls that he thought this injury was permanent and, thus, Mr. Earls would probably not be able to do any heavy work (R. at 339-40) and recommended that Mr. Earls do a sit-down job with limited walking. (R. at 339.)

On January 8, 2003, Mr. Earls complained to Dr. Eaton of severe headaches along with vomiting and shaking for the past 3 months. (R. at 422.) He also complained of left side nerve

damage. *Id.* On January 16, 2003, Mr. Earls again complained to Dr. Eaton of having continued headaches associated with vomiting, as well as generalized pain. (R. at 416.) He was also seen walking with a cane. *Id.* The drug Celebrex was added to his other medications. (R. at 417.)

On February 27, 2004, Mr. Earls complained to Dr. Eaton of continuous migraines occurring over the past month, which he rated as a 10 on a 10-point pain scale. (R. at 385.) On March 5, 2004, Mr. Earls reported to Dr. Eaton that the Relpax samples, which he had been taking for the last week, did not relieve his headaches. (R. at 383.) On March 12, 2004, Mr. Earls reported in a follow-up visit with Dr. Eaton that he had headaches all day, every day, with vomiting. (R. at 380.) Mr. Earls also complained of chronic back and leg pain. *Id.*

On January 18, 2005, Mr. Earls visited Dr. Eaton and complained of rib pain on the left side that had been occurring over the past 4 months. (R. at 377.) Dr. Eaton noted tenderness in the ribs. *Id.* On March 23, 2005, Mr. Earls complained of continuing problems with headaches as well as abdominal pain that had been occurring over the last 6 months. (R. at 376.)

## 2.    Medical History after Onset Date of August 15, 2005

On March 7, 2006, after moving from Florida to Indiana, Mr. Earls began seeing Kurt Madsen, D.O. ("Dr. Madsen"), an orthopedic surgeon. (R. at 298.) Mr. Earls reported a medical history that included right hip fracture and repair, Brown-Sequard Syndrome with neurological complaints of the left upper and left lower extremities along with migraines, cervical pain and upper back pain. *Id.* Dr. Madsen noted the following under his "impression[s]": (1) chondromalacia[1] of the right hip with positive crepitus and grinding; (2) migraine cephalgia

---

[1] A condition that refers to the softening of cartilage. Knee Injuries & Osteoarthritis, WebMD (Oct. 15, 2011), http://www.webmd.com (follow "Arthritis Health Center" hyperlink; then follow "Osteoarthritis Health Center" hyperlink).

secondary to cervical kyphosis[2] and multi-level arthritis; (3) status post hardware removal of the right hip; and (4) right femoral hernia.[3]  *Id.*  On March 30, 2006, in a follow-up with Dr. Madsen, Mr. Earls complained of increased migraines and "profound pain" from his hernia.  (R. at 297.) Dr. Madsen treated Mr. Earls with an injection of Toradol to help with his pain and inflammation.  *Id.*

On April 21, 2006, Dr. Madsen completed a "Medical Assessment of Ability To Do Work-Related Activities (Physical)" at the request of the Administration.  (R. at 172-75.)  Dr. Madsen opined that Mr. Earls could occasionally lift and carry up to 10 pounds, but never lift or carry more than 10 pounds.  (R. at 172.)  In an 8-hour workday, Mr. Earls could sit a total of 4 hours, stand a total of 1 hour, and walk a total of 2 hours.  (R. at 173.)  Mr. Earls could not sit, stand or walk for more than 1 hour at a time.  *Id.*  Dr. Madsen's opinions were based upon medical findings of degenerative joint disease, also known as osteoarthritis.  (R. at 173.)  Dr. Madsen assessed that Mr. Earls could frequently use his hands for simple grasping and fine manipulation, but he could only occasionally use his feet.  *Id.*  This assessment was based on office evaluations.  *Id.*  As for postural activities, Dr. Madsen opined that Mr. Earls could never stoop, crouch, kneel, or crawl, and only occasionally climb; however, Mr. Earls could frequently balance.  (R. at 174.)  As for physical functions, Dr. Madsen opined that Mr. Earls was limited to only occasionally reaching, handling and pushing/pulling.  *Id.*  These opinions were again based upon findings of degenerative joint disease involving the hip, lumbar spine and cervical spine. *Id.*

---

[2] A condition described as the loss of the normal curve of the neck with typical symptoms including chronic pain, numbness, weakness, and tingling in the extremities.  Improving the Maintenance of Cervical Kyphotic Deformity Correction, Mayo Clinic, http://www.mayoclinic.org/medicalprofs/cervical-kyphotic-deformity.html (last visited July 2, 2012).

[3] A femoral hernia is a bulge in the upper area of the thigh towards the groin, and often results from a part of the small intestines pushing through a tear in the muscular wall of the abdomen.  Femoral Hernia, MedlinePlus (Sept. 12, 2010), http://www.nlm.nih.gov/medlineplus/ency/article/001136.htm.

On May 16, 2006, Michael W. Kennedy, M.D. ("Dr. Kennedy"), performed an evaluation of Mr. Earls at the request of the Indiana Disability Determination Division.  (R. at 360.)  In his examination, Dr. Kennedy found that Mr. Earls ambulated with a normal gait and was "stable at station."  (R. at 362.)  Mr. Earls also appeared comfortable in seated and supine positions.  *Id.*  In the abdomen, Dr. Kennedy discovered a "small easily reducible non-tender right inguinal hernia."  (R. at 363.)  Dr. Kennedy's exam of Mr. Earls's cervical spine revealed "tenderness to palpation over the spinous processes" and his right hip also revealed tenderness.  (R. at 364.)  The examination of Mr. Earls's knees, feet and ankles revealed no crepitus, tenderness or swelling.  *Id.*  The neurological exam revealed that Mr. Earls's cranial nerves 2 through 12 were "grossly intact."  *Id.*  Mr. Earls could not tell the difference between hot and cold on the outside of his left leg and arm.  *Id.*  Dr. Kennedy diagnosed Mr. Earls with Brown-Sequard syndrome by history, status post right hip fracture, chronic daily headaches and right inguinal hernia.  (R. at 361.)  Dr. Kennedy found no limitations to Mr. Earls's ability to perform work-related activities in the workplace.  *Id.*

On May 25, 2006, Richard Wenzler "(Dr. Wenzler"), a state agency medical consultant, performed a "Physical Residual Function Capacity Assessment" on Mr. Earls.  (R. at 366-73.)  Dr. Wenzler found that Mr. Earls was able to lift and/or carry 10 pounds frequently and 20 pounds occasionally (R. at 367) that he could sit, stand and walk 6 hours in an 8-hour workday, and occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl.  (R. at 368.)  Mr. Earls could never climb ladders, ropes or scaffolds, *Id.*, and he needed to avoid concentrated exposure to extreme cold and heat, humidity, noise, vibration, pulmonary irritants, and hazards, such as machinery and heights.  (R. at 370.)  Dr. Wenzler found no manipulative, visual or communicative limitations.  (R. at 369-70.)  In regards to symptoms, Dr. Wenzler found Mr.

Earls's allegations only partially credible. (R. at 371.) Although the nature of each symptom was supported by medical evidence and other evidence, the severity of the symptoms was not supported by the medical evidence or any other evidence. *Id.*

On August 14, 2006, Dr. Madsen wrote a general letter regarding Mr. Earls's condition. (R. at 265-66.) Dr. Madsen recounted Mr. Earls's medical history beginning with his work injury in 2001. (R. at 265.) Dr. Madsen noted that Mr. Earls was diagnosed with Brown-Sequard Syndrome, and that Mr. Earls had to have his hip hardware removed because it was "backing out of the bone." *Id.* Dr. Madsen stated that Mr. Earls returned to work as a baker about three years after the accident; however, Mr. Earls was unable to continue after a year due to the severe pain from his previous injuries, as well as a right femoral hernia, sustained while working. (R. at 265-66.) Dr. Madsen noted that Mr. Earls's hernia had yet to be repaired because Mr. Earls lacked insurance and income. (R. at 266.) Finally, Dr. Madsen indicated Mr. Earls was suffering from severe depression due to his deteriorating medical problems. *Id.*

In addition, within the same August 2006 letter, Dr. Madsen identified clinical evidence of decreased range of motion and chondromalacia with crepitus and grinding in the right hip, an abnormal gait in Mr. Earls's walk, x-rays that showed severe degeneration of the right hip and indicated the need for a hip replacement, and x-rays of his cervical spine that showed cervical kyphosis and multi-level post-traumatic arthritis that causes migraine cephalgia. *Id.* Dr. Madsen also reported that Mr. Earls frequently falls and drops items due to increased paraplegia. As a result of the limitations described in the report, Dr. Madsen concluded that Mr. Earls was permanently and totally disabled. (R. at 266.) On November 8, 2006, Dr. Madsen again wrote a general letter stating that Mr. Earls was totally disabled. (R. at 248.)

On October 24, 2006, Roger Bailey, M.D. ("Dr. Bailey"), began seeing Mr. Earls for his medical problems. (R. at 188.) Mr. Earls complained of worsening pain in his head, neck, back, hips and legs and indicated that his worst pain came from his migraines. *Id.* Upon examination, Dr. Bailey found decreased sensation over the left lateral leg to the foot, an antalgic gait, and a depressive mood. *Id.* Dr. Bailey's assessment included chronic pain syndrome, history of migraine headaches, and right inguinal hernia. *Id.* He gave Mr. Earls samples of Lyrica, a drug used to treat pain caused by nerve damage, WebMD, Drugs, supra, and recommended that he apply for Medicaid. (R. at 188.)

On December 11, 2006, Mr. Earls reported to Dr. Bailey that his pain had not improved with Lyrica. (R. at 187.) Dr. Bailey prescribed Pamelor, a drug used to treat depression, WebMD, Drugs, supra, and recommended consultation with a neurologist and mental health specialist. (R. at 187.) On January 15, 2007, Mr. Earls reported to Dr. Bailey that he recently underwent hernia repair surgery. (R. at 186.) Mr. Earls complained of moderate pain in the right hip, right foot and groin, as well as headaches. *Id.* Dr. Bailey scheduled an MRI of Mr. Earls's head and neck, and he recommended that Mr. Earls reschedule his neurology consultation. *Id.*

On January 22, 2007, Gary D. Rusk, M.D. ("Dr. Rusk"), a neurologist, began evaluating Mr. Earls's headaches. (R. at 194.) Dr. Rusk's examination determined that Mr. Earls had the following: (1) mild weakness of finger grip and finger abduction of his left hand, (2) minimal to mild decrease of strength in his left elbow and left shoulder, (3) mild decrease of strength in left wrist motion, (4) mild decrease in strength of hip flexion and knee extension, (5) minimal decrease in strength of flexion of his left knee, (6) good strength in movement of the ankles and toes of the left foot, (7) good strength throughout his right arm and leg, (8) mild increase in tone of the left arm and leg, and (9) normal tone of his right side. *Id.* Dr. Rusk also discovered

decreased sensation of the left fourth and fifth fingers, decreased sensation of the left leg, knee, ankle, and toes, minimal dystaxia[4] of the left arm, and a hemiparetic gait due to the hernia surgery.  (R. at 196.)   Dr. Rusk also diagnosed likely migraine headaches, and prescribed Amitriptyline, to help Mr. Earls sleep and to treat his migraine headaches.  (R. at 196.)

On March 14, 2007, Mr. Earls reported to Dr. Rusk in a follow-up visit that the Amitriptyline did not help his headaches.  (R. at 197.)  Dr. Rusk reviewed MRI scans of Mr. Earls's head and cervical spine that took place after his January 2007 visit.  *Id.*  The MRI of Mr. Earls's head was normal, as well as the MRI of his cervical spine, with "no impingement on the spinal cord or nerve roots at any level."  *Id.*  In addition, Dr. Rusk's examination revealed the following:  (1) weakness of the left arm and leg with mildly increased tone, (2) good strength through his right arm and leg with normal tone of his right side, (3) decreased sensation over the medial aspect of the fourth and fifth fingers in the left hand, (4) decreased sensation in the medial aspect of the right forearm, (5) decreased vibration sensation over the fifth knuckle on the left hand, (6) decreased vibration sensation of the left knee, ankle and toes, (7) decreased sensation over the left leg, (8) minimal dystaxia of the left arm, and (9) Mr. Earls walked with a minimally hemiparetic gait favoring his left leg.  (R. at 197-98.)  Dr. Rusk indicated that Mr. Earls's history of recurrent headaches was probably due to migraines and stated that he would start Mr. Earls on Depakote, to prevent migraines and a short course of Prednisone.  (R. at 198.)

On September 19, 2008, Mr. Earls began treatment at St. Vincent Clay Family Practice ("St. Vincent") (R. at 542).  Mr. Earls reported that he had trouble maintaining a physician because he lost medical coverage in April 2008.  *Id.*  Mr. Earls was diagnosed with chronic pain of the hip, back and neck, severe migraines, paresthesias of his left side, depression and cervical

---

[4] A condition marked by a lack of muscle coordination during voluntary movements.  Ataxia, Mayo Clinic (Mar. 1, 2011), http://www.mayoclinic.com/health/ataxia/DS00910.

muscle spasms. *Id.* He was prescribed Lyrica, Treximet (which treat migraines), Lexapro (which treats depression and anxiety), Valium (which treats anxiety and seizures), Vicodin (relieves moderate to severe pain), and Omeprazole (which treats stomach and esophagus problems), WebMD, Drugs, supra. (R. at 542.)

On September 26, 2008, x-rays of Mr. Earls's pelvis revealed an old, healed fracture of the right femoral neck. (R. at 565.) His hip joint spaces were normal, and there were no indications of other acute abnormalities. *Id.* X-rays of Mr. Earls's right hip revealed a healed intertrochanteric fracture of the right femoral neck with no acute abnormality. *Id.* The x-rays of the cervical spine showed facet degenerative changes in the lower cervical spine but no acute abnormalities. *Id.*

On October 28, 2008, Mr. Earls returned to St. Vincent complaining of migraines and worsening pain in his hip, back and neck. (R. at 546). Mr. Earls requested "samples of any meds possible." *Id.* Mr. Earls was given a two month supply of Lexapro, three bottles of Treximet, a box of Senokot and Percocet. (R. at 546.) A follow-up with a physician for further evaluation was recommended to Mr. Earls. (R. at 546.)

On November 11, 2008, nurse practitioner Shauna Poe ("nurse practitioner Poe"), a certified family nurse practitioner, and Paul Houston, M.D. ("Dr. Houston"), of St. Vincent, wrote a letter in response to Dr. Gerber's assessment of Mr. Earls at the request of Mr. Earls's attorney at the time. (R. at 540). In the letter, nurse practitioner Poe and Dr. Houston opined that as a result of Mr. Earls's medical conditions, Mr. Earls could not stand or walk for more than 5 to 10 minutes intermittently throughout the day, and Mr. Earls would need the assistance of a cane. *Id.* Mr. Earls could sit for 1 to 2 hour intervals occasionally, but he could not sit for 6 to 8 hours in a workday. *Id.* Mr. Earls could not carry any significant weight due to his need for

a cane, and Mr. Earls would not be able to bend, twist, and stoop on a regular basis.  *Id.*  It was also noted that Mr. Earls's "debilitating headaches" that occur "almost daily" would affect his ability to work.  *Id.*

On November 24, 2008, Mr. Earls complained to nurse practitioner Poe of persistent numbness and dull aching pain in his left lower extremity.  (R. at 548.)  Nurse practitioner Poe diagnosed Mr. Earls with chronic pain, chronic migraines and neuropathy.  *Id.*  She prescribed him Percocet, Lyrica, Vicodin, Diazepam, and OxyContin. (R. at 548.)  On December 23, 2008, Mr. Earls reported to St. Vincent that he injured himself by falling in the bathroom.  (R. at 550.)  Mr. Earls complained that numbness in his lower extremities and lack of coordination caused the fall.  *Id.*  Mr. Earls was prescribed refills on his medications as well as crutches for his "unsteady gait."  *Id.*  On February 6, 2009, Dr. Houston prescribed Mr. Earls a wheelchair.  (R. at 553-56.)

On August 14, 2009, Nurse practitioner Poe and Dr. Houston wrote a general letter describing Mr. Earls's medical history and condition.  (R. at 571.)  Nurse practitioner Poe and Dr. Houston noted that Mr. Earls required the use of a wheelchair most of the time and could occasionally use crutches or a walker.  *Id.*  Also, Mr. Earls suffered from "debilitating headaches" that were "poorly controlled with medication."  *Id.*  They also recounted that Mr. Earls had difficulty in maintaining a physician due to his lack of insurance and finances, and thus he was without treatment from April 2008 to September 2008.  *Id.*  Because Mr. Earls suffered from Brown-Sequard Syndrome with left-sided paraplegia and daily debilitating migraine headaches, nurse practitioner Poe and Dr. Houston opined that Mr. Earls was permanently disabled and unable to perform any kind of full time, competitive work.  *Id.*

**D.      The Administrative Hearing**

**1.      Mr. Earls's Testimony**

On October 14, 2008, Mr. Earls testified he was prescribed a cane by Dr. Eaton when he sustained his 2001 work injury.  (R. at 608.)  Mr. Earls stated he did not have any files in the record to substantiate this fact because he was told those files went too far in the past and were not relevant.  *Id.*

At the hearing held on May 20, 2009, Mr. Earls testified that he last worked in 2005 as a night watchman and baker.  (R. at 614.)  His doctor in Florida had advised him not to work, but he felt that he "could do something."  (R. at 615.)  Ultimately, Mr. Earls stopped working in 2005 due to migraines, back pain, and a strangulated hernia for which he had an operation.  (R. at 615, 618.)  Mr. Earls stated he could not work anymore because he would "drop stuff all the time" due to paralysis on his left side that was a result of his 2001 work injury.  (R. at 618, 622.)  Mr. Earls's attorney described his job in 2005 as a work attempt that lasted for a year.  (R. at 619.)

Mr. Earls testified that since his 2001 work accident, his symptoms and condition have progressively gotten worse every day.  (R. at 621-22.)  For example, in 2001, he was having 1 to 2 migraines a day, but in 2005, he had progressed to 3 to 4 migraines a day, each much more "violent" than in 2001.  (R. at 624.)  In response to these migraines, Mr. Earls stated he would need to lie down in a dark room.  *Id.*  Mr. Earls stated he had increased numbness on his left side, arthritis, and pain in his lower back, right hip, right femur and right knee.  (R. at 627-29.)  In addition, the pain on his right side was worse because of the numbness on his left side.  (R. at 629.)  Mr. Earls also explained that Dr. Houston prescribed him a wheelchair in 2009 because he frequently fell and had recently broken his front teeth in a fall.  (R. at 625-26.)

14

Mr. Earls testified that he lies down frequently because he is uncomfortable with walking and standing due to his pain and numbness. (R. at 629.) Mr. Earls estimated that he could sit no more than 2 hours and he was able to drive 80 miles to the hearing, but he had to stand up twice during that period. (R. at 629-30). After he sits for 2 hours, Mr. Earls needs to lie down. (R. at 631). Mr. Earls estimated that he probably spent 40% of his day lying in his bedroom in the dark. *Id.* Mr. Earls testified that his pain medication sometimes caused slurred speech, but, other than that, his medication did not cause any side effects. *Id.*

### 2.    Medical Expert's Testimony

At the hearing on October 14, 2008, Dr. Gerber testified that Mr. Earls's conditions did not meet a Medical Listing. (R. at 605). Dr. Gerber stated the record documented two conditions: (1) a history of right hip fracture dating to 2001, and (2) a history of migraine headaches with medication non-compliance. *Id.* Dr. Gerber found that Mr. Earls should be able to walk up to 4 hours in an 8-hour workday and lift and carry 10 pounds frequently and 20 pounds occasionally. *Id.*

Upon review of updated medical evidence, Dr. Gerber stated in a letter dated October 20, 2008, that he saw "no reason to change the opinion [he] rendered in the October 14 hearing." (R. at 522). The record documented the presence of migraine headache, gastroesophogeal reflux disease (GERD), and a history of right hip fracture. *Id.* Dr. Gerber wrote that Mr. Earls could stand/walk up to 4 hours in an 8-hour workday, sit 6 hours in an 8-hour workday, lift/carry 10 pounds frequently and 20 pounds occasionally, and occasionally perform postural activities. *Id.*

On July 29, 2009, Dr. Gerber responded to a set of interrogatories from Mr. Earls's attorney. (R. at 558-62). Dr. Gerber indicated he had treated other patients with Brown-Sequard Syndrome, and he listed the symptoms as "weakness or paralysis on one side of the body with

loss of sensation on the other side of the body." (R. at 558). Dr. Gerber stated that although the syndrome was noted within Mr. Earls's file, he saw no objective evidence to support a diagnosis that Mr. Earls actually had Brown-Sequard Syndrome. *Id.* According to Dr. Gerber, a nurse practitioner was not qualified to request a wheelchair based on alleged worsening symptoms of Brown-Sequard Syndrome or to determine that he had an unsteady gait. (R. at 559).

Dr. Gerber indicated that he did consider Mr. Earls's left-sided paresthesias in his assessment, but he noted paresthesias is subjective and does not result in functional impairments. (R. at 560). He also considered Mr. Earls's allegations of back pain in reaching his opinion, as well as the effect of migraine headaches on Mr. Earls's concentration, persistence, and pace. (R. at 560-61). Dr. Gerber also considered the impact of medication side effects. (R. at 561).

### 3.     The Vocational Expert's Testimony

David Janus, the vocational expert ("the VE"), testified that a hypothetical individual with the vocational profile of Mr. Earls and the limitations outlined in Dr. Gerber's October 20, 2008 letter would not be able to perform Mr. Earls's past relevant work. (R. at 633). The VE stated that this individual would be able to perform light work with a sit/stand option. (R. at 633-34). Jobs that matched this description that were available in the local and national economy included:  (1) a parking lot cashier with 500 positions locally and 42,000 nationally, (2) an assembler with 400 positions locally and 100,000 nationally, and (3) a packer with 500 positions locally and 85,000 nationally. *Id.* The VE also testified that this individual could perform unskilled work that is sedentary with a sit/stand option. (R. at 634-35). Jobs that matched this description that were available in the local and national economy included:  (1) an assembler with 600 positions locally and 130,000 nationally, and (2) an addresser with 500 positions locally and 42,000 nationally. *Id.* Finally, The VE testified that an individual who missed work more

than 1 to 2 days a month for 3 to 6 months as a result of migraine headaches would be unable to maintain these jobs.  (R. at 635).

## II.  DISABILITY AND STANDARD OF REVIEW

To be eligible for DIB, a claimant must have a disability under 42 U.S.C. § 423(e) (2006).  "Disability" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . [that] can be expected to result in death or . . . [that] has lasted or can be expected to last for a continuous period of not less than 12 months."  § 423(d)(1)(A).  In determining whether a claimant is disabled, an ALJ applies a five step process set forth in 20 C.F.R. § 404.1520(a)(4):

1. If the claimant is employed in substantial gainful activity, the claimant is not disabled.

2. If the claimant does not have a severe medically determinable physical or mental impairment or combination of impairments that meets the duration requirement, the claimant is not disabled.

3. If the claimant has an impairment that meets or is equal to an impairment listed in the appendix to this section and satisfies the duration requirement, the claimant is disabled.

4. If the claimant can still perform the claimant's past relevant work given the claimant's residual functionality capacity, the claimant is not disabled.

5. If the claimant can perform other work given the claimant's residual functional capacity, age, education, and experience, the claimant is not disabled.

The burden of proof is on the claimant for the first four steps; it then shifts to the Commissioner at the fifth step.  *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992).

The Social Security Act, specifically 42 U.S.C. § 405(g), provides for judicial review of the Commissioner's denial of benefits.  When the Appeals Council denies review of the ALJ's findings, the ALJ's findings become the findings of the Commissioner.  20 C.F.R. § 404.981;

s*ee, e.g.*, *Henderson v. Apfel*, 179 F.3d 507, 512 (7th Cir. 1999).  This Court will sustain the

ALJ's findings if they are supported by substantial evidence.  42 U.S.C § 405(g); *Nelson v.*

*Apfel*, 131 F.3d 1228, 1234 (7th Cir. 1999).  This Court will "reverse the ALJ's findings only if

they are not supported by substantial evidence or if the ALJ applied an erroneous legal standard."

*Id.*  In reviewing the ALJ's findings, the Court may not decide the facts anew, reweigh the

evidence, or substitute its judgment for that of the ALJ.  *Nelson*, 131 F.3d at 1234.  Although a

mere scintilla of evidence is insufficient to support the ALJ's findings, the substantial evidence

standard requires "no more than 'such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion.'"  *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995) (quoting

*Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

The ALJ "need not evaluate in writing every piece of testimony and evidence submitted."

*Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993).  However, the "ALJ's decision must be

based upon consideration of all the relevant evidence."  *Herron v. Shalala*, 19 F.3d 329, 333 (7th

Cir. 1994).  Further, "[a]n ALJ may not select and discuss only that evidence that favors his

ultimate conclusion, but must articulate, at some minimum level, his analysis of the evidence to

allow the [Court] to trace the path of his reasoning.  *Diaz*, 55 F.3d at 307.  An ALJ's articulation

of his analysis "aids [the Court] in [its] review of whether the ALJ's decision was supported by

substantial evidence."  *Scott v. Heckler*, 768 F.2d 172, 179 (7th Cir. 1985).

### III.  DISCUSSION

#### A.     The ALJ's Findings

In his decision, the ALJ found that Mr. Earls met the disability insured status

requirements of the Social Security Act through March 31, 2009, and that Mr. Earls had not

engaged in substantial gainful activity since the alleged onset date of August 15, 2005.  (R. at

18).   The ALJ also found that Mr. Earls suffered from two severe impairments:  (1) "a history of right hip fracture in April 2001," and (2) "migraine headaches and non-compliance with medication."  *Id.*  From there, the ALJ found that Mr. Earls had no impairment or combination of impairments that met or medically equaled one of the listed impairments found under Appendix 1 of 20 C.F.R. § 404.1520(d).  (R. at 19).

The ALJ assessed Mr. Earls with a residual functional capacity ("RFC") to perform a limited range of light work as defined under 20 C.F.R. § 404.1567(b).  *Id.*  The ALJ concluded that Mr. Earls could frequently lift and/or carry 10 pounds and occasionally lift and/or carry 20 pounds.  *Id.*  He could stand and/or walk 4 hours in an 8-hour workday, and he had no limitations on sitting.  *Id.*  The ALJ also found that Mr. Earls could occasionally climb, balance, stoop, kneel, crouch or crawl and that Mr. Earls's medically determinable impairments could reasonably be expected to produce his symptoms, but he found Mr. Earls's allegations regarding the intensity, persistence, and limiting effects of his symptoms to not be credible to the extent they were inconsistent with the RFC assessment.  (R. at 21).  The ALJ indicated that Mr. Earls's "complaints [were] not consistent with the objective evidence," and therefore lacked credibility.  *Id.*

Based on Mr. Earls's RFC assessment, the ALJ found Mr. Earls unable to perform any past relevant work; however, the ALJ concluded Mr. Earls was able to perform other jobs that existed in significant numbers in the national economy.  (R. at 25-26).  As a result, Mr. Earls was not disabled at any time from his alleged onset date through the date last insured.  (R. at 26).

**B.     Mr. Earls's Arguments on Appeal**

Mr. Earls makes three arguments on appeal.  First, he argues the ALJ violated the treating physician rule by not giving Dr. Madsen's opinion controlling weight.  In the alternative, Mr.

Earls argues that even if the ALJ was not required to give Dr. Madsen's opinion controlling weight, the ALJ failed to analyze the appropriate factors to determine the amount of weight to give Dr. Madsen's opinion.   Second, Mr. Earls argues the ALJ's credibility assessment was flawed because he failed to comply with 20 C.F.R. § 404.1529 and SSR 96-7p in assessing Mr. Earls's symptoms.   Third, Mr. Earls argues the ALJ relied upon flawed vocational expert testimony because the ALJ's hypothetical question to the VE was not supported by substantial evidence.   Mr. Earls asks this Court to reverse the Commissioner's decision and award benefits, or in the alternative, remand his case for further administrative proceedings.   Each of Mr. Earls's arguments is addressed in turn.

### 1.   Treating Physician Rule

Mr. Earls asserts the ALJ erred because he failed to adhere to the treating physician rule. A treating physician's opinion about the nature and severity of a claimant's impairment is given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the claimant's record. 20 C.F.R. § 404.1527(c)(2); *Moss v. Astrue*, 555 F.3d 556, 560 (7th Cir. 2009); *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008).   However, "once well-supported contradicting evidence is introduced, the treating physician's evidence is no longer entitled to controlling weight."   *Hofslien v. Barnhart*, 439 F.3d 375, 376 (7th Cir. 2006).   The treating physician's opinion thus becomes merely a piece of evidence the ALJ must weigh.   *Id.* at 377. At that point, in evaluating what weight to accord the treating physician's opinion, the ALJ must consider:   (1) the length, nature and extent of the treatment relationship, (2) the frequency of examination, (3) the supportability of the opinion, (4) the consistency of the opinion with the record, (5) the specialization of the treating source, and (6) other factors that tend to support or

contradict the opinion.  *See, e.g.*, 20 C.F.R. § 404.1527(c)(2)-(6); *Hofslien*, 439 F.3d at 377; *Moss*, 555 F.3d at 561 (stating that the regulations require the ALJ to consider the factors under 20 C.F.R. § 404.1527(c)(2)-(6) when a medical opinion is not given controlling weight).

### a.  Controlling Weight

Mr. Earls asserts the ALJ erred because he failed to give the opinion of Dr. Madsen, a treating physician as defined under 20 C.F.R. § 404.1502, controlling weight without reasons supported by substantial evidence in the record.  In his decision, the ALJ accorded Dr. Madsen's opinion "little weight" because it was "inconsistent with the clinical signs, results of diagnostic examinations, medical opinions, and evidence of . . . [Mr. Earls's] functional abilities."  (R. at 25).  In addition, the ALJ noted Dr. Madsen was solicited by Mr. Earls's former attorneys for new clients.  *Id.*  Also, earlier in the decision, the ALJ indicated that Dr. Madsen's medical assessment "failed to note that . . . [Mr. Earls's] migraines and other impairments were basically untreated."  (R. at 23).  Mr. Earls takes aim at the ALJ's determination for various reasons.  As discussed in the paragraphs below, the Court finds that the ALJ was justified in not giving Dr. Madsen's opinion controlling weight, even though the ALJ made a harmless error in reaching this conclusion.

First, although Mr. Earls alleges the ALJ erroneously considered his alleged non-compliance with treatment as a reason for according Dr. Madsen's opinion little weight, it is not clear from the ALJ's decision that this fact was used as a consideration in that determination. The ALJ does not state that observation within the section of his decision where he explains the weight he accorded the various doctors' opinions.  Instead, the ALJ notes this observation within the section where he recounts Mr. Earls's medical history.  Therefore, no inference can be drawn that the ALJ used this factor in determining the weight to give Dr. Madsen's opinion.

Second, Mr. Earls asserts that it was improper for the ALJ to "reject" Dr. Madsen's opinion because Mr. Earls's attorneys solicited the opinion.  In *Punzio v. Astrue*, the Seventh Circuit held "the fact that relevant evidence has been solicited by the claimant or her representative is not a sufficient justification to belittle or ignore that evidence."  630 F.3d 704, 712 (7th Cir. 2011).  After all, because the claimant has the burden of proof in establishing his or her impairment and RFC, the claimant must necessarily ask his or her doctor to weigh in.  *Id.* The Commissioner does not argue the validity of this reasoning, but instead argues that the ALJ drew no inferences from his notation that Mr. Earls's attorneys solicited Dr. Madsen's opinion. This argument, however, is undermined by the context in which this detail is found.  The ALJ states this fact within the section of his decision detailing the weight he gave to each doctor's opinion.  He also states this fact within the same sentence in which he concludes Dr. Madsen's opinion is inconsistent with other evidence.  No other purpose can be surmised from the inclusion of this fact other than as a description of Dr. Madsen used to buttress the finding of inconsistency.  It is telling that no other doctor within this section received any further description or observations from the ALJ.  Therefore, it can be inferred that the ALJ noted this detail to support his conclusion of giving little weight to Dr. Madsen's opinion.  The ALJ was in error to consider this fact in determining the weight to accord Dr. Madsen's opinion.

In the end, however, the Court finds that the ALJ's error was harmless.  In *Spiva v. Astrue*, Judge Posner held that "[i]f it is possible with great confidence that the agency will reinstate its decision on remand because the decision is overwhelmingly supported by the record though the agency's original opinion failed to marshal that support, then remanding is a waste of time."  628 F.3d 346, 353 (7th Cir. 2010).  Here, even if the ALJ were to strike the consideration of the attorney's solicitation, the ALJ would still be well-justified in finding that Dr. Madsen's

opinion was not entitled to controlling weight because there was well-supported contradictory evidence.  *See Hofslien*, 439 F.3d at 376.  Dr. Kennedy performed an examination on Mr. Earls and found no limitations to his ability to work within months of Dr. Madsen's finding that Mr. Earls was totally disabled.  Also, Dr. Wenzler's RFC assessment was quite different from Dr. Madsen's physical assessment of Mr. Earls despite both being completed a little over a month of each other.

Finally, although Mr. Earls asserts that the ALJ erred by "placing undue weight on Mr. Earls's activities as inconsistent with his allegations," (Dkt. 16 at 15), this argument relates to the ALJ's credibility assessment of Mr. Earls's statements regarding his symptoms.  Regardless, Dr. Madsen's medical assessment is inconsistent with evidence of Mr. Earls's reported daily activities he submitted on his Agency forms.  Dr. Madsen described Mr. Earls as bedridden, with his family assisting him in his daily living activities.  Mr. Earls, on the other hand, reported doing some household chores and never mentioned family assistance.  As a result, substantial evidence exists to support the ALJ's finding that Dr. Madsen's opinion was not entitled to controlling weight.

### b.    Determination of Weight with Factors

Because Dr. Madsen's opinion was not given controlling weight, the regulations require the ALJ to determine the amount of weight to give the opinion by considering the factors under 20 C.F.R. § 404.1527(c)(2)-(6).  *See Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010).  Social Security Ruling 96-2p states that medical opinions from treating sources are "entitled to deference and must be weighed using all the factors provided in 20 C.F.R. § 404.1527."  61 Fed. Reg. 34490 (July 2, 1996).  Mr. Earls asserts the ALJ failed to analyze Dr. Madsen's opinion under these factors.  The Court agrees.

The ALJ's decision must include specific reasons, supported by evidence in the record, for the amount of weight an ALJ accords to a treating physician's opinion.  SSR 96-2p.  The ALJ's reasoning must be "sufficiently specific to make clear to any subsequent reviewers" the weight given to the treating physician's opinion and why the ALJ arrived at that determination. *Id.*  Here, the ALJ's determination is not sufficiently specific to make clear why he accorded Dr. Madsen's opinion little weight.

Aside from the ALJ erroneously considering the fact that Mr. Earls's attorneys solicited Dr. Madsen's opinion, the ALJ's only other stated reason for giving Dr. Madsen's opinion little weight is because he found it inconsistent with the record.  (R. at 25).  Although consistency with the record is an enumerated factor of consideration under § 404.1527(c), the Court is left to speculate as to why Dr. Madsen's opinion is inconsistent.  *See Clifford v. Apfel*, 227 F.3d 863, 870-71 (7th Cir. 2000) (finding ALJ did not adequately explain why the treating physician's findings were inconsistent with other medical evidence of record and remanded for further evaluation).  In other words, the ALJ's statement is conclusory and fails to articulate his reasoning as to how he arrived at that decision.

As explained earlier, the Court did find enough contradictory evidence in the record to support a finding that Dr. Madsen's opinion was not entitled to controlling weight; however, the Court cannot find harmless error in the ALJ's failure to consider the factors under § 404.1527(c) because the Court cannot say with great confidence that the ALJ will reach the same decision in the amount of weight to accord Dr. Madsen's opinion on remand.  Stated differently, the former analysis is more like a bright line test whereas the latter analysis is more like a weighing and balancing test; although enough inconsistencies exist in the record to support the fact that Dr. Madsen's opinion is not entitled to controlling weight, those same inconsistencies are affected by

an analysis of the factors under § 404.1527(c) that can render them less significant in terms of weighing the doctors' opinions.

For example, despite a difference in conclusions of Mr. Earls's ability to work, Dr. Madsen and Dr. Kennedy shared many consistencies. Dr. Madsen's medical findings showed degenerative joint disease of the hip, lumbar spine and cervical spine. This seems to be consistent with Dr. Kennedy's physical examination that indicated Mr. Earls's cervical spine revealed tenderness to the touch. Both doctors also found a hernia on Mr. Earls's right abdomen/groin area. In addition, Dr. Madsen identified clinical evidence of crepitus and grinding in the right hip, and Dr. Kennedy noted that Mr. Earls's right hip revealed tenderness. Also, Dr. Madsen reported that Mr. Earls frequently falls and drops items due to increased paraplegia. This seems entirely consistent with Dr. Kennedy's diagnosis that Mr. Earls has Brown-Sequard Syndrome. In fact, because the two doctors had such different conclusions from their seemingly consistent medical findings, it was even more important that the ALJ consider the other factors listed under § 404.1527(c) so that it could be determined whose opinion should be accorded more weight. An analysis of the physicians' specialization as well as the aspects of their treatment relationship with Mr. Earls would have been particularly helpful. Unfortunately, this analysis is entirely absent from the ALJ's decision.

So far as Dr. Madsen's consistency with other physicians is concerned, his opinion that x-rays of Mr. Earls's cervical spine showed cervical kyphosis and post-traumatic arthritis that causes migraine cephalgia is consistent with the opinions of Dr. Bailey, Dr. Rusk and Dr. Houston, who found Mr. Earls suffered from likely migraines. Although Dr. Rusk, a neurologist, did not find any nerve damage upon review of MRI scans of Mr. Earls's head and cervical spine, this does not necessarily translate into an inconsistency with Dr. Madsen's opinion that Mr. Earls

suffered from migraines and degenerative joint disease.  *See Moss*, 555 F.3d at 561 (stating that a neurologist evaluates different aspects of an injury than an orthopedic specialist, and the lack of a neurological cause for claimant's condition does not undercut the orthopedic specialist's opinion whose "specialty is the function of the musculoskeletal system, extremities, spine, and associated structures").    Dr. Rusk  was  specifically  looking  for  nerve  damage  and  Dr.  Madsen  was specifically looking for problems associated with Mr. Earls's musculoskeletal system and spine. *See id.*  Plus, even though Dr. Rusk found Mr. Earls's MRI of his head to be normal, he still indicated that Mr. Earls's "recurrent headaches [were] probably due to persistent migrainous activity." (R. at 198).  Again, the ALJ did not consider the different specialties of the doctors in his determination of how much weight to give Dr. Madsen's opinion.  Nor did the ALJ consider any of the other factors listed under 20 C.F.R. § 404.1527(c).  Simply stated, the ALJ failed to apply the correct legal standard when determining the weight to accord Dr. Madsen's opinion, and this failure necessitates remand.

### c.      Certified Nurse Practitioner Poe and Dr. Houston

Mr. Earls also argues the ALJ failed to analyze the opinion of nurse practitioner Poe and Dr. Houston under the factors listed in 20 C.F.R. § 404.1527(c)(2)-(6) when he afforded the opinion no weight.  The Court agrees with Mr. Earls's assertion.  Although the ALJ gave some detail as to why he found their opinion garnered no weight—pointing out they relied primarily on Mr. Earls's subjective complaints—the ALJ's reasoning was not specific enough to inform the reviewer why their opinion was inconsistent with the record and other medical opinions. Thus, this issue, too, should be addressed on remand.

### 2.    Application of 20 C.F.R. § 404.1529 and SSR 96-7p

Mr. Earls next asserts the ALJ failed to comply with 20 C.F.R. § 404.1529(c) in assessing Mr. Earls's credibility because the ALJ evaluated Mr. Earls's statements regarding his symptoms with the ALJ's own RFC assessment and personal observations of Mr. Earls rather than with evidence of the record.  Mr. Earls also asserts the ALJ failed to comply with SSR 96-7p because the ALJ found Mr. Earls lacked credibility without giving any specific reasons.  In other words, the ALJ's decision gave no indication that he considered the listed factors under SSR 96-7p and 20 C.F.R. § 404.1529(c)(3)(i)-(vii) when assessing the credibility of Mr. Earls's statements, and thus, he did not make clear what weight he accorded Mr. Earls's testimony.

As part of the RFC determination, the ALJ must consider all of the claimant's symptoms. 20 C.F.R. § 404.1529(a); SSR 96-4p, 61 Fed. Reg. 34488 (July 2, 1996); SSR 96-7p, 61 Fed. Reg. 34483 (July 2, 1996).  In considering the claimant's symptoms, the ALJ first determines whether a medically determinable impairment exists that could reasonably be expected to produce the claimant's symptoms.  20 C.F.R. § 404.1529(b)-(c); SSR 96-4p; SSR 96-7p.  If a medically determinable impairment exists, the ALJ then evaluates the intensity, persistence and functionally limiting effects of the claimant's symptoms to determine how those symptoms affect the claimant's capacity to work.  *Id.*  Thus, the ALJ is required to make a credibility assessment of the claimant's statements regarding his or her symptoms and their functional effects.  SSR 96-7p.

Because certain symptoms, such as pain, are inherently subjective, the ALJ needs to "carefully consider" information submitted by the claimant regarding his or her symptoms in reaching a decision "about the credibility of the [claimant's] statements if a disability determination or decision that is fully favorable to the [claimant] cannot be made solely on the

27

basis of objective medical evidence." *Id.*; *see also* 20 C.F.R. § 404.1529(c)(3). In making this credibility assessment, the ALJ is required to consider all available evidence in the record, including: objective medical evidence, the claimant's statements about symptoms, information and statements provided by the claimant's treating or non-treating sources as well as others regarding the symptoms and how they affect the claimant, and any other relevant evidence within the record. SSR 96-7p; *see also* 20 C.F.R. § 404.1529(c)(3). The ALJ must also consider the following factors:

1. The individual's daily activities;

2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;

3. Factors that precipitate and aggravate the symptoms;

4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p; *see also* 20 C.F.R. § 404.1529(c)(3).

The ALJ's determination "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p. The ALJ cannot make a "single, conclusory statement" that states the claimant's symptoms have been considered or that the ALJ

28

finds the allegations not credible.  *Id.*  In *Parker v. Astrue*, for instance, Judge Posner held that this type of "meaningless boilerplate" is not sufficient to give a claimant an understanding of the amount of weight the judge accorded the claimant's testimony.  597 F.3d 920, 921-22 (7th Cir. 2010).

After finding that Mr. Earls had the RFC to perform a limited range of light work, the ALJ stated in his decision that he had considered all of Mr. Earls's symptoms and the extent to which they were reasonably consistent with the objective medical evidence and other evidence as required by 20 C.F.R. § 404.1529 and SSR 96-7p.  The ALJ then gave a recapitulation of Mr. Earls's testimony.  The ALJ next concluded that although Mr. Earls's "medically determinable impairments could reasonably be expected to cause the alleged symptoms[,]" he did not find Mr. Earls's statements regarding the intensity, persistence and limiting effects to be credible "to the extent they [were] inconsistent with the . . . [RFC] assessment."  (R. at 21).  The ALJ stated he found Mr. Earls's complaints to be inconsistent with the objective evidence.  Plus, although Mr. Earls complained of being in pain because he had not taken his pain medication the day of the hearing, the ALJ did not find that Mr. Earls showed "any observable pain behavior during the hearing."  *Id.*  The ALJ next gave an extensive recapitulation of Mr. Earls's medical history before concluding with an explanation of the weight he accorded to each treating and non-treating source.

This Court finds the ALJ's statements regarding consideration of Mr. Earls's symptoms and allegations to be the type of boilerplate that the Seventh Circuit has deemed inadequate.  Although the Commissioner argues the ALJ's credibility determination is supported by substantial evidence, the ALJ has failed to give an analysis that carefully considers evidence

submitted by Mr. Earls and that gives Mr. Earls specific reasons for not finding his allegations regarding his symptoms as fully credible.

Social Security Ruling 96-7p states that "[t]he reasons for the credibility finding must be grounded in the evidence and articulated in the . . . decision." *See also Rohan v. Chater*, 98 F.3d 966, 971 (7th Cir. 1996) (stating that the ALJ must "sufficiently articulate his assessment of the evidence and . . . enable [the court] to trace the path of the ALJ's reasoning."). The Commissioner argues the credibility assessment was proper because the ALJ considered the medical evidence of the record in his finding that Mr. Earls's allegations lacked credibility. The ALJ's statements, however, are conclusory and devoid of reasoning. Although the ALJ states Mr. Earls's complaints are "simply" inconsistent with the objective evidence, Mr. Earls and the Court are left to figure out why Mr. Earls's complaints are inconsistent. (R. at 21).

Indeed, the Court's own review of the record did not unearth obvious inconsistencies. For example, the ALJ seems to suggest an inconsistency (but, again, it is unclear) in Mr. Earls's testimony by stating that although Mr. Earls testified to numbness on his left side, his April 2001 work accident caused injury to his right hip. (R. at 21). Yet, at least two doctors, Dr. Probst and Dr. Kennedy, diagnosed Mr. Earls with Brown-Sequard Syndrome, a neurological condition that results in weakness or paralysis on one side of the body and *a loss of sensation* on the *opposite side*. Mr. Earls's allegation of numbness on the left side would thus seem to be consistent with an individual injured on his right side who was suffering from Brown-Sequard.

In *Gudgel v. Barnhart*, the Seventh Circuit held that "[a]n ALJ can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice." 345 F.3d 467, 470 (7th Cir. 2003). Here, the only doctor who stated he did not think Mr. Earls had Brown-

Sequard was the medical expert Dr. Gerber, a non-examining physician.  *See* 20 C.F.R. § 404.1502 (defining a non-examining source as a medical source that has not performed an examination on the claimant, like a medical expert the Administration uses for consultation). Neither Dr. Gerber nor the ALJ gave any explanation as to why Dr. Gerber found the diagnosis of the treating physicians inconsistent with the medical evidence.  See *Clifford*, 227 F.3d at 870-71 (remanding where ALJ did not adequately explain why findings of the treating physician were necessarily inconsistent with other medical evidence of record).  Interestingly, the ALJ purported to give "substantial weight" to the medical opinions of Dr. Probst and Dr. Kennedy but only "great weight" to Dr. Gerber.  It appears, however, that the ALJ believed Dr. Gerber's opinion over the opinions of Dr. Probst and Kennedy, contrary to his accorded weight distribution.  If this is an accurate statement of his reasoning, then not only is the inconsistency not obvious, but it appears to possibly be a serious error in reasoning.  *See Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004) (holding that remand is appropriate where ALJ has based his credibility assessment on serious errors in reasoning).

The ALJ might also be suggesting an inconsistency in Mr. Earls's testimony when he stated that Mr. Earls testified to a worsening condition since his April 2001 accident, but he had a treatment note in February 2002 that indicated he was neurovasculary intact and x-rays of the right knee were normal.  (R. at 21).  One treatment note dated less than a year from the date of his injury and three years before Mr. Earls's onset date of disability can hardly be said to disprove or even shed doubt on the allegation that Mr. Earls's condition is worsening.  *Compare Punzio*, 630 F.3d at 710 (remanding because the ALJ relied on a single treatment note to contradict a doctor's assessment), *with Sutherland v. Astrue*, No. 2:11 Civ. 24, 2012 WL 911898, at *10 (N.D. Ind. Mar. 15, 2012) (finding ALJ did not cherry-pick but relied on multiple dates

within the doctor's treatment notes).  Overall, an ALJ that merely states a claimant's testimony is inconsistent with objective evidence and then restates the facts of the claimant's medical history without drawing any connections, as if the inconsistencies will jump off the page, has not performed a proper credibility assessment to make clear what weight he accorded the claimant's testimony.  *See Clifford*, 227 F.3d at 872 (holding that while an ALJ does not need to discuss every piece of evidence, he does need to articulate legitimate reasons and "build an accurate and logical bridge from the evidence to his conclusion").

In addition, SSR 96-7p states that a claimant's statements regarding "the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work" cannot be tossed aside "solely because they are not substantiated by objective medical evidence."  The Commissioner argues the ALJ did consider other evidence because the ALJ made an observation that Mr. Earls did not look like he was in pain at the May 2009 hearing despite having not taken any pain medication.  In *Powers v. Apfel*, the Seventh Circuit stated that while the court was uncomfortable with a "sit and squirm" test, an ALJ's observation of the claimant had always been endorsed by the court in determining credibility.  207 F.3d 431, 436 (7th Cir. 2000).  The Seventh Circuit further qualified this statement when it held that the ALJ's observation of the claimant in *Powers* could not render the ALJ's credibility assessment patently wrong because it was "one of several factors that contributed to the [ALJ's] credibility determination."  *Id.*  Here, the ALJ's decision does not evidence any consideration of the factors enumerated under SSR 96-7p.  *See also* 20 C.F.R. § 404.1529(c)(3).  Admittedly, elements of these factors may exist within the recapitulation of Mr. Earls's testimony and medical history, but again, the ALJ does not articulate any of his reasoning to reveal his considerations.

In sum, the ALJ's failure to articulate his reasoning and his failure to follow the proper assessment of credibility as dictated by SSR 96-7p necessitates remand as well. The ALJ's credibility determination fails to make clear to Mr. Earls and this Court the weight he accorded Mr. Earls's statements and the reasons for that weight. SSR 96-7p. The Court is by no means suggesting the ALJ was incorrect in his credibility determination; that will be for the ALJ to determine on remand. Rather, the crux of this Court's decision is that the ALJ needs to do a better job of "showing his work," enabling the Court and Mr. Earls to follow an accurate and logical bridge from the evidence to his conclusion.

### 3.      Hypothetical Question to Vocational Expert

Finally, Mr. Earls argues the ALJ's hypothetical question to the VE was flawed because it was not supported by substantial evidence. More specifically, the hypothetical question was flawed because the ALJ based it entirely on the opinions from the non-examining physicians, Dr. Wenzler and Dr. Gerber.

An ALJ's hypothetical question to a vocational expert needs to "be supported by the medical evidence in the record." *Ehrhart v. Sec'y of Health and Human Servs.*, 969 F.2d 534, 540 (7th Cir. 1992). The hypothetical question must also "include all limitations supported by medical evidence in the record." *Stewart v. Astrue*, 561 F.3d 679, 684 (7th Cir. 2009). Here, the ALJ posited his hypothetical question at the May 2009 hearing by premising the hypothetical on "those functional limitations referred to by Dr. Gerber." (R. at 633). Given the ALJ's failure to apply the correct legal standard in determining the weight to accord Dr. Madsen's opinion, the possible error in rejecting Dr. Probst and Dr. Kennedy's diagnosis of Brown-Sequard, and the improper credibility assessment, the ALJ should reevaluate his hypothetical question posed to the VE, as it could be affected by his determination of the issues on remand.

33

## IV.  **CONCLUSION**

For the reasons stated herein, the decision of the Commissioner of the Social Security

Administration in this case is **REMANDED** for further proceedings consistent with this opinion.


SO ORDERED.    07/25/2012


Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana


DISTRIBUTION:


Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov, pearlie.wadlington@usdoj.gov, lin.montigney@usdoj.gov

Eddy Pierre Pierre
LAW OFFICES OF HARRY J. BINDER AND CHARLES E. BINDER, P.C.
fedcourt@binderandbinder.com